,|udse Graham
delivered, the opinion of lije Court.
Park and Clark were parties in the purchase of hogs for foreign market. In the year 1840, having sold hogs in Georgia on credit, they deposited with Dansforth notes pf the purchasers to the amount of $2,687 33¿ and took his receipt therefor, dated 28th December, 1840, which reads as follows; “Received from Park & Clark the following notes for collection, which, when collected, I ant to format'd to Kentucky in a check on the Northern Bank of Kentucky,” and after giving a list of the notes, says, “all of which I pronounce good, and (think) most of them will be paid at maturity.
*240 Park & Clark being indebted to several persons in this State, did on the 19th May, 1841, assign Dansforth’s receipt to McMonigle for the use and benefit of himself and five other persons named in the assighment, “to be apportioned by him to the payment of the notes due them for hogs,” &c.
Dansforth remitted money, from time to time, until he had paid about thirteen hundred dollars. The proof shows very clearly, that at the time of the date of his receipt to Park & Clark, he was embarrassed in his pecuniary circumstances, and if he had then been pressed by his creditors, would have failed. About May 1841, his condition could no longer be concealed, and shortly afterwards, he became insolvent. It seems from his deposition, which has been taken in this cause, that he collected the whole amount of the notes left in'his hands, except a debt due from himself for $200, and a debt due from Burdett, which, in the list, is stated at $236 75. Burdett had also failed, and was insolvent. McMonigle had in the meantime died. It is very clearly shown by the proof of Toombs and others, that if suit had been brought on Dansforth’s receipt at the time it was assigned to McMonigle, or at any time afterwards, not one cent could have been .made by coercive legal process. On the other hand, it appears very probable, from the statements of Dansforth himself and other witnesses, that had personal and direot application been made at his residence in Georgia, between the dates of May and August 1841, he would have paid the whole, or the greater part of the balance due on the receipt, but not in par money. He however continued to pay as his creditors applied, until all his means were exhausted.
This suit has been instituted by Park & Clark, and now presented by the latter as survivor, with the view of making McMonigle and those for whose use the receipt was transferred, responsible for the residue of the amount left in Dansforths hands, and which he has failed to pay over. Their supposed liability is based on the fact that McMonigle did not, nor did either of the oth *241 ei\s visit Georgia, and there, by process of law, or direct personal application to Dansforth, attempt to collect the amount due from him, which as already intimated, the complainants charge could have been done; and finally that the defendants are responsible, because they did not use that diligence which the circumstances of the case required of them.
It is said that a person who receives bonds and notes as collateral security for a debt, is bound to use due diligence, and if they are afterwards lost, through his negligence, by the insolvency of the makers, he is chargeable with the amount. This rule of law we suppose not to be applicable to the facts in this case. Here no bonds or notes were placed in the hands of McMonigle, but only the receipt of a man living in a distant State, and in whose integrity and fidelity, Park & Clark fully trusted. At the time this receipt was assigned, McMonigle was known to be. in feeble health, and in fact laboring under a fatal disease, of which he afterwards died; that at the time he received the receipt he was physically unable to have travelled to Georgia. The receipt of Dansforth shows, upon its face that it was not expected that any one would be at the trouble and expense of a tedious journey to receive the money from him. His undertaking was to transmit the money when collected to Kentucky. Clark certainly expected the agency to be carried on by written communication. He undertook to apprise Dansforth of the assignment to McMonigle. This promise he seems not to have complied with until August 1841, about which time Dansforth became almost, if not entirely hopelessly insolvent. Clark’s letters of that date and his several subsequent letters up to as late a date as January 1842, all show not only that he expected a transmission by check from Dansforth, but that he regarded it as his duty to aid by epistolary correspondence in the collection of the demands. The testimony of one or two of the witnesses, is at least very persuasive that this mode of collection was the only one con *242 templated by the parties at the time of the assignment in May 1841.
The case of Barrow, assignee of Prior, vs Rhinelander, (3 J. C. R. 615,) which is referred to by the Circuit Judge as sustaining his opinion, is certainly very essentially different from the present. In that case “the defendant was the confidential clerk of the merchant, and had free access to all his papers and money. From the beginning almost of their connection, Prior was embarrassed and had recourse to the defendant for moneys. This created at once a delicate relation between them; and the rapidity with which loans and debts were accumulated, securities exacted, the load of dependency increased, and blind and necesitous submission yielded, is distressing to learn even as told in defendant’s answer:” (1 J. C. R. 556.) In that case, it was also clearly proved, that in addition to the bonds and notes assigned to the clerk, other notes were taken by him from the merchant’s possession without his knowledge or consent. It was very properly determined by the Chancellor, (3 Johnson’s Ch. Rep. 620,) “that by the fraudulent conduct of the defendant, he made himself justly chargeable with the amount of the notes, or at least for so much of them as were lost from want of prosecution in due season, because instead of exercising a reasonable- and equitable discretion in the collection of the notes, his conduct was perverse and unconscientious, tyranical, oppressive, and unjust: (S. C. 622.)
It hardly need not be said that no such facts exist in this case. On the contrary,, the parties sought to be charged, seem to have acted throughout in good faith-Taking into consideration all the circumstances and facts developed in this case, we are of opinion, that neither McMonigle, or either of the others, was under any obligation of duty to go to Georgia, that neither of them. ha^ been guilty of gross neglect; that the debts have not been lost through their inattention, and that, therefore, the complainants were not entitled to a decree..
*243 The decree of the Circuit Court is therefore reversed, and the cause is remanded to that Court with directions to dismiss the complainant’s bill with costs.